UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON

| | |
|---|---|
| **PI TELECOM INFRASTRUCTURE V, LLC, a Delaware Limited Liability Company, CELLCO PARTNERSHIP D/B/A VERIZON WIRELESS, a Delaware General Partnership, ALBERT DAVID BURKE, an individual,** | **CIVIL ACTION NO. 5:16-46-KKC** |
| **Plaintiffs,** | |
| **V.** | **MEMORANDUM OPINION AND ORDER** |
| **GEORGETOWN-SCOTT COUNTY PLANNING COMMISSION,** | |
| **Defendant.** | |

Plaintiffs, PI Telecom Infrastructure V, LLC, Cellco Partnership d/b/a Verizon Wireless, and Albert Burke, (collectively as the Applicants), challenge the Defendant's, the Georgetown-Scott County Planning Commission (the "Commission"), denial of their application to construct a cell phone tower on a 36.5 acre tract of land in Scott County, Kentucky, as violative of the Telecommunications Act of 1996, 47 U.S.C. § 151 *et seq*. (the "TCA") and Kentucky law. Applicants seek an order from this Court directing the Commission to grant their application for the proposed facility.

This matter is now before the Court on the parties' cross-motions for summary judgment. For the reasons discussed herein, the Applicants' motion for summary judgment is granted and the Commission's motion is denied.

## I.    BACKGROUND

A. <u>Telecommunications Act</u>

Congress enacted the TCA to promote competition between service providers that would inspire the creation of higher quality telecommunications services and to encourage the rapid deployment of new telecommunications technologies. *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115 (2005). In so doing, "Congress recognized zoning decisions by state and local governments had created an inconsistent array of requirements, which inhibited both the deployment of personal communications services and the rebuilding of a digital technology-based cellular telecommunications network." *Preferred Sites, LLC v. Troup County*, 296 F.3d 1210, 1214 (11th Cir. 2002) (citing H.R.Rep. No. 104–204, at 94 (1995), reprinted in 1996 U.S.C.C.A.N. 10, 61). "Congress also acknowledged 'there are legitimate State and local concerns involved in regulating the siting of such facilities,'" *Preferred Sites,* 296 F.3d at 1214 (quoting H.R. Rep. No. 104–204, at 94–95 (1995), reprinted in 1996 U.S.C.C.A.N. 10, 61), and drafted the Act so as to "'preserve[ ] the authority of State and local governments over zoning and land use matters except in . . . limited circumstances.'" *Id.* (quoting H.R. Rep. No. 104–458, at 207–08 (1996), reprinted in 1996 U.S.C.C.A.N. 124, 222).

Therefore, the TCA was designed to strike a proper balance between two competing and often clashing policy concerns: national need for the growth of wireless telephone service and local authority to control the placement of those needed cell phone towers. *See* H.R. Conf. Rep. No. 104–458, at 207–09 (1996); *see also Omnipoint Commc'ns, Inc. v. City of White Plains*, 430 F.3d 529, 531 (2d Cir. 2005). On one side

of the balance, the TCA generally "preserves traditional authority of state and local governments to regulate the location, construction, and modifications" of wireless communications facilities such as cell phone towers. *T-Mobile South, LLC v. City of Roswell, Ga.*, 135 S. Ct. 808, 814 (2015) (internal quotations omitted). On the other side, the TCA imposes specific substantive and procedural limitations on that authority by reducing the impediments that local governments can impose to defeat or delay the installation of wireless communications facilities and by protecting against "irrational or substanceless decisions by local authorities." *Sw. Bell Mobile Sys., Inc. v. Todd*, 244 F.3d 51, 57 (1st Cir. 2001); *T-Mobile Cent. LLC v. Unified Gov't of Wyandotte Cnty., Kansas City, Kan.*, 546 F.3d 1299, 1306 (10th Cir. 2008).

As a part of these limitations, the TCA provides that local cell tower regulation "shall not prohibit or have the effect of prohibiting the provision of personal wireless services." § 332(c)(7)(B)(i)(II). To enforce the substantive limitations on localities, the TCA also mandates that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." § 332(c)(7)(B)(iii). In addition, the TCA provides a mechanism for enforcement if any party is, in their view, adversely affected by a locality's decision. *See* § 332(c)(7)(B)(v).

In this case, the Court is called upon to enforce the balance Congress sought to achieve.

B. <u>Facts</u>[1]

PI Telecom constructs, owns, and manages wireless telecommunications facilities that are used by national and regional wireless carriers to provide personal wireless service to customers. (Compl. ¶ 1). Verizon is a national wireless carrier licensed by the Federal Communications Commission that provides wireless communication services within its licensed areas, including Scott County, Kentucky. (Compl. ¶ 2). PI Telecom and Verizon entered into a lease with Mr. Burke, who owns a 36.5-acre tract of land, permitting PI Telecom and Verizon to construct a 195-foot monopole wireless communications facility on the Burke property.

Verizon sought to construct the wireless communication facility after radio frequency engineers analyzed Verizon's existing network and coverage needs and identified a "significant gap" in Verizon's coverage in the area east of I-75 and south of Paris Road (U.S. 460) in Scott County. Verizon then enlisted PI Telecom to develop a wireless communications facility within the "significant gap" discovered by Verizon engineers. PI Telecom considered several sites, but identified Mr. Burke's property as the parcel that would provide the "optimum coverage for [Verizon's] wireless service" and would "comply with local zoning requirements related to set backs."

---

[1] The Court will only consider the evidence contained in the record that the Commission itself purportedly considered. *See T-Mobile Cent., LLC v. City of Grand Rapids*, No. 1:06-CV-747, 2007 WL 1287739, at *4 (W.D. Mich. May 2, 2007) ("[W]hen evaluating whether the [commission's] decision is supported by substantial evidence, the Court may consider only that evidence contained in the administrative record which was presented to the [commission]."); *Sprint Spectrum, L.P. v. Zoning Bd. of Adjustment*, 606 F. App'x 669, 672 (3d Cir. April 20, 2015) (holding that an analysis under § 332(c)(7)(B)(iii) "applies to decisions made solely on the basis of the factual record before the agency and are the subject of deferential substantial evidence review"). Therefore, the Tillotson emails dated January 22 and 25 will not be considered. The substance of the material, however, was made available to the Commission when Mr. Tillotson presented at the public hearing and is included in the DVD of the public hearing.

(Binder Submitted By Applicant for Planning Commission – Tab D – Alternative Site Analysis, p. 4).

On October 1, 2015, Applicants submitted their Uniform Application to the Commission for consideration. In the Uniform Application, Applicants proposed to construct "a 255' self-support wireless communications tower with a 5' lightening arrestor for a total structure height of 260'." (Planning Commission Folder – A-1). The Uniform Application included: (1) FCC License Documentation; (2) a site development plan; (3) a site survey; (4) a vertical tower profile; (5) a map of adjoining landowners; (6) directions to the site; (7) tower and foundation designs; (8) a copy of the lease agreement with Mr. Burke; (9) a list of residents notified about the proposed tower; (10) notice to adjoining landowners and the Commission; (11) a radio frequency engineer report; (12) a geotechnical study report; and (13) a list of FCC registered antenna structures within a three-mile radius of the proposed facility. (Planning Commission Folder – A-1).

In the weeks after the Uniform Application was submitted, the Commission raised several issues with the application, including the height of the proposed structure and compliance with the Commission's resident notification policy. (Planning Commission Folder – A-5). Specifically, a Planning Department email dated October 16, 2015, commented that the 260' tower would require a variance from the Scott County zoning ordinance. (Planning Commission Folder – A-5).

On November 30, 2015, Applicants and the Commission entered into an agreement to extend the time the Commission had to make a final decision on the Uniform Application. Under KRS § 100.987(4)(c), a planning commission must:

> Advise the applicant in writing of its final decision within sixty (60) days commencing from the date that the uniform application is submitted to the planning commission or within a date certain specified in a written agreement between the local planning commission and the applicant. If the planning commission fails to issue a final decision within sixty (60) days and if there is no written agreement between the local planning commission and the applicant to a specific date for the planning commission to issue a decision, the uniform application shall be deemed approved.

As a result of the agreement, both Applicants and the Commission agreed to postpone the final-decision date to January 15, 2016. (Planning Commission Folder – A-4).

On December 22, 2015, almost a month after the agreement to extend the time to make a final decision, Applicants submitted an amended Uniform Application. The amended application included the following changes:

1. Revised zoning drawings and surveys changing the tower to a 195' monopole tower with a 4' lightning arrestor for a total height of 199'.
2. Revised tower and foundation drawings of the proposed monopole tower structure.
3. Revised Geotechnical Report.
4. A report from [a] Verizon engineer describing the coverage gap that the 195' monopole tower could remedy.

(Planning Commission Folder – A-1; DE 18-1, p. 6 n. 5).

The Commission's Planning Staff prepared and submitted a report on January 14, 2016, after reviewing the Uniform Application and the December 22nd addendum. After detailing the various aspects of the amended Uniform Application, the Planning

6

Staff concluded that "[t]he proposal appears to meet the conditions of the Zoning Ordinance and the Subdivision & Development Regulations." (Planning Commission Folder – A-2, Staff Report, p. 4). In addition, the Staff Report addressed specific concerns of local property owners regarding the proposed tower. Regarding concerns about the tower's environmental impact, the Staff Report indicated that the proposed tower was located "outside of all Environmentally Sensitive Areas as described by ordinance and the Comprehensive Plan" and that the tower was "not located in the flood plain . . . as defined by the Comprehensive Plan." (Planning Commission Folder – A-2, Staff Report, p. 4). Concerning whether the Applicants made sufficient effort to co-locate, the Planning Staff noted that "[t]he Applicant provided documentation describing the site selection process. There are no existing towers or sufficiently tall structures near enough for the Applicant to co-locate on that will allow them to address their gap in coverage." (Planning Commission Folder – A-2, Staff Report, p. 4).

On the same day, the Applicants' Uniform Application went before the Commission for public hearing. Mr. Summers, a member of the Planning Staff, began the proceedings by reviewing the Commission's Planning Staff Report. Mr. Summers summarized the Staff Report for the Commission and reaffirmed the Staff Report's finding that the Uniform Application complied with the applicable ordinances and comprehensive plan. (Planning Commission Folder – A-2, Minutes, p. 5). Mr. Summers also addressed the numerous letters and communications from members of the public concerning the tower and dismissed many of the raised concerns as having

been addressed in the Staff Report.  (Planning Commission Folder – A-2, Minutes, p. 5).

Attorney David Pike then began his presentation for Applicants. Mr. Pike reviewed the Uniform Application with the Commission and specifically opined to the Commission that the proposed tower in no way violated the comprehensive plan. (Planning Commission Folder – A-2, Minutes, p. 6; DVD of Public Hearing 1:41:00 to 2:35:00). As a part of his presentation, Mr. Pike submitted a planning report, a property value report, and a tower engineering report. He also made the experts who created those reports available for cross-examination. Mr. Pike then asked the Commission to stipulate that each expert adopted their respective reports as their testimony. (DVD of Public Hearing 2:20:00 to 2:23:00). Mr. Pike also tendered the Staff Report and Applicants' Hearing Binder into the record. (DVD of Public Hearing 2:23:00 to 2:24:00). No objections were heard.

After making his presentation, Mr. Pike addressed several questions from the Commission concerning the height of the proposed tower. Mr. Pike called Verizon's engineer, Mr. Arbabshirani, to answer specific concerns about the coverage area of the proposed tower and its possible overlap with any neighboring towers. (Planning Commission Folder – A-2, Minutes, p. 7; DVD of Public Hearing 2:27:12 to 2:29: 34).

Before opening the meeting to the public, counsel for the Commission, Mr. Perkins, provided his initial thoughts about the legal arguments Mr. Pike made in his presentation. Mr. Perkins opined that Mr. Pike was "very accurate" in his telling

of the applicable law and how it related to the Uniform Application. (DVD of Public Hearing 2:49:10 to 2:49:40).

After Mr. Pike's presentation, the Chairman of the Commission, Mr. Jones, opened the meeting to the public. Several area residents spoke in opposition to the application. (Planning Commission Folder – A-2, Minutes pp. 7-13). Mr. Woodson spoke to his concern that the cell tower site would be located on particularly prime farmland, a location with immense value to the local residents. (Minutes, p. 7, DVD 2:52:00 to 2:53:30). Next, Ms. Rowles and Mr. Irwin spoke to the collective concern of local residents who felt that the tower's construction, while potentially lucrative for Mr. Burke, would come at the expense of local Scott County residents. (Planning Commission Folder – A-2, Minutes pp. 8-9).

Mr. Tillotson spoke next. Mr. Tillotson asserted several reasons for why the Commission should reject the Uniform Application. Referring to Zoning Ordinance 2.55(F)(19), Mr. Tillotson noted that Applicants failed to submit co-location documentation. He argued that Applicants were unjustified in failing to provide the required co-location documentation because the application itself relied on erroneous information. (DVD of Public Hearing 03:25:23 to 03:33:38). He also argued that the Uniform Application contravened the comprehensive plan because construction of the communications tower would disregard the plan's goal to protect sensitive and historic areas in Scott County and, specifically, would jeopardize proposed future plans to preserve the sensitive area where the tower would be located. (DVD of Public Hearing 03:38:00).

After Mr. Tillotson, several other citizens stood to object to the Uniform Application, citing environmental concerns about the construction of the tower and other general concerns about the aesthetic impact and health hazards that a cell phone tower would cause. (Planning Commission Folder – A-2, Minutes pp. 11-13).

Mr. Pike responded to the public comments by noting that many of the concerns addressed by the residents, while sincere, simply have no relevance in the applicable law and as to whether the Uniform Application should be approved. (Planning Commission Folder – A-2, Minutes, p. 13). He also emphasized that the Uniform Application is supported by the Zoning Ordinances and that Applicants complied with all the requirements in submitting the application. (Planning Commission Folder – A-2, Minutes p. 13).

Once Mr. Pike concluded his response, more public comments were heard. The dialogue largely mirrored that of the first round of public comments. Two new objections were raised, however. Mr. Tillotson again spoke to express his opinion that both the comprehensive plan and Applicants' omission of the required co-location documentation provided the Commission with a sufficient basis on which to deny the Uniform Application. He also stated that Applicants submitted reports after the corrections deadline. (Planning Commission Folder – A-2, Minutes pp. 14-15). Mr. Summers responded by telling the Commission that it is not unusual for applicants to submit new supporting documentation late. (Planning Commission Folder – A-2, Minutes p. 15). After Mr. Perkins noted that the Commission and Applicants agreed under Kentucky law to render a decision by January 15, Mr. Offutt, another resident,

raised his concern about the Commission's ability to consider the voluminous application in the short time frame prior to the January 15 deadline established by Kentucky law. (Planning Commission Folder – A-2, Minutes p. 15).

After several more minutes of back and forth between members of the public, the Commission, and Mr. Pike, Chairman Jones closed the public hearing. The Commission then discussed the matter among themselves. A few minutes later, Commissioner Sulski made a motion to deny the Uniform Application based on "the wrong location on the map," "lack of proof of collocating," and "sloping of a bank 70-80' to Elkhorn Creek from the site." (Planning Commission Folder – A-2, Minutes p. 17; DVD of Public Hearing 6:01:10). Commissioner Sulski made the motion "to deny and defer to a higher court." (DVD of Public Hearing 06:01:37). Commissioner Sulski's motion was seconded by Commissioner Shirley. (Planning Commission Folder – A-2, Minutes p. 17). By a roll call vote, the motion to deny the application carried six to one, with Commissioner Moran dissenting. (Planning Commission Folder – A-2, Minutes p. 17).

On February 11, 2016, the minutes of the public hearing were approved and sent to Applicants on February 22, 2016. Aside from the minutes, the record is void of any written documentation expressly denying the Uniform Application.

Three days before the minutes of the public hearing were approved, Applicants file suit under the TCA and Kentucky law, seeking an order from this Court requiring the Commission to grant their Uniform Application for the proposed cell phone tower.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists when the evidence shows "that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*. at 252.

The moving party has the initial burden of identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Once the movant has satisfied this burden, "the nonmoving party must go beyond the pleadings and come forward with specific facts to show there is a genuine issue for trial." *Chao*, 285 F.3d at 424 (citing Celotex, 477 U.S. at 324). The nonmoving party, however, "must do more than show there is some metaphysical doubt as to the material fact. It must present significant probative evidence in support of its opposition to the motion for summary judgment." *Chao*, 285 F.3d at 424 (internal citations omitted).

"When reviewing cross-motions for summary judgment, the court must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th

Cir. 1994) (citing *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)).

The trial court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact," and "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001).

## III.   DISCUSSION

The parties have filed competing motions for summary judgment. Applicants argue that the Commission failed to submit a written denial and that the decision rendered by the Commission was not otherwise supported by substantial evidence contained in the written record as required by 47 U.S.C. § 332(c)(7)(B)(iii). Applicants also allege that substantial evidence shows that the Commission's decision has the effect of "prohibiting the provision of personal wireless services" in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II). Lastly, Applicants allege that the Commission's failure to issue a written decision within the agreed upon timeframe violated KRS 100.987(4)(c) and was otherwise arbitrary.

The Commission does not address these contentions. Instead, the Commission argues that Applicants' submission of the December 22nd addendum constituted a "new" application, which thereby renders moot the entirety of Applicants' motion for summary judgment.

13

The Court will address these contentions in turn, beginning with the issue raised by the Commission.

A. Whether Applicants' Amended Uniform Application Constitutes a "new application" to Create a Genuine Issue of Material Fact

The sole argument put forth by the Commission in the entirety of its moving papers is as follows. When Applicants submitted a supplement to their Uniform Application on December 22, 2015, they, in effect, submitted an entirely new Uniform Application, and this material alteration resets any obligation the Commission had under its agreement with Applicants under KRS 100.987(4) to render a written decision by January 15, 2016. This change, the Commission suggests, creates a genuine issue of fact that renders all of Applicants' TCA and state law claims moot and, if the Court held otherwise, it would infringe upon the due process rights of the citizens of Scott County. (DE 21-1, p. 8). As a remedy, the Commission asks the Court to remand the case to the Commission to repeat the application review process.

As an initial matter, the Court finds that no genuine issue of material fact exists in the present case. Neither party disputes that Applicants submitted the December 22nd addendum to their original Uniform Application. Neither party disputes that it was this amended application that was analyzed by the Planning Staff, submitted to the Commission, and subsequently denied by the Commission. Here, the Commission raises an issue of law, arguing that the "new" application should reset the statutory deadlines agreed upon by the parties and required by the TCA.

As a threshold matter, Applicants argue that the Commission should be estopped from presenting this "new application" theory because they received no indication throughout the application process that the amended application was anything but an amendment (DE 22, p. 7) and that the issue is nevertheless waived because the Commission failed to make the argument at the administrative level (DE 22, 7-8).

Parties have the duty to preserve error in an administrative hearing. *See Freytag v. C.I.R.*, 501 U.S. 868, 899 (1991) (consideration of alleged error during administrative hearing is "procedurally barred as a result of petitioner's failure to raise it in his administrative proceeding"); *Cox v. Benefits Review Bd.*, 791 F.2d 445, 447 (6th Cir. 1986) (reviewing court cannot "consider an argument which has not been raised in the agency proceeding which precedes the appeal"); *Howard v. Cumberland River Coal Corp.*, No. 205-CV-1704-WC, 2016 WL 4490579, at *2 (Ky. Ct. App. Aug. 26, 2016) (citing *Urella v. Ky. Bd. of Med. Licensure*, 939 S.W.2d 869, 873 (Ky. 1997)). ("[F]ailure to raise an issue before an administrative body precludes that issue from judicial review.").

The Court finds that the issue of a "new application" was never raised at the public hearing, nor did the Commission even discuss on record that the December 22, 2015 amendment to the Uniform Application should be considered a "new application." In support of the notion that the issue was raised, the Commission points to Mr. Offutt's complaint about whether the Commission had sufficient time in which to consider the voluminous Uniform Application in all of its parts. (DVD of

Public Hearing 05:36). But nowhere in his remarks did Offutt suggest that Applicants' amendment to the Uniform Application should serve to reset the applicable deadlines. Moreover, the Commission did not even discuss the time crunch after Offutt raised concerns and did not mention that the deadline should be extended because of the December 22nd addendum.

The only other instance in which the "new" application issue was ostensibly addressed is found in Mr. Tillotson's speech. In response to Applicants' counsel's discussion of the co-location reports, Mr. Tillotson remarked that "the additional information [] provided by the applicant . . . was submitted after the deadline for changes to the application." (DVD of Public Hearing 5:18-5:20). However, neither Mr. Tillotson nor the Commission specify the deadline to which he was referring. Mr. Summers' response to the concern indicates that there may have been a deadline for submitting application changes, (Planning Commission Folder – A-2, Minutes p. 15), but no specifics are discussed. In any event, the Commission did not address the issue and did not lodge any objection to any of the material submitted by Mr. Pike. Thus, the issue of "a new application" is not properly before this Court.

The Commission fails to offer any authority that supports the notion that a change in an application somehow resets the application process and untethers it from the requirements of the TCA or the parties' agreed upon January 15, 2016 deadline made pursuant to KRS 100.987(4)(c).

The Commission cites *Hampson v. Boone County Planning Commission*, 460 S.W.3d 912 (Ky. Ct. App. 2014), in support of its argument. However, the case does

not help the Commission's cause. Although far from deciding the issue, *Hampson* suggests that applications can be modified or amended without restarting procedural deadlines as long as the parties do not trigger any statutory requirements while amending to the application. *Hampson* does nothing, however, to suggest that an amendment to an application creates a "new" application that resets all of the Commission's existing obligations under Kentucky law or the TCA. Without more, the Court rejects this argument.

Separate from whether the amended application constituted a "new application" to extend the time in which the Commission had to respond, the inclusion of the supplemental information provided by Applicants did not violate procedural due process. The fundamental requirement of procedural due process is simply that all affected parties be given "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). The record reflects that the Commission was given the opportunity to be heard on every matter related to the construction of the wireless communications tower, specifically the December 22, 2015 amendment that was submitted by Applicants. Indeed, the Commission's own Planning Staff Report, presented by Mr. Summers at the public hearing, used the changes in the supplement in explaining Applicants' application to the Commission. (Planning Commission Folder – A-2, Staff Report pp. 1-3; Binder of Material from Hearing on January 14, 2016 – B-2, Planning Commission Staff PowerPoint presentation). The Court fails to see how the December 22, 2015 supplement violated the procedural due process rights of the Commission or the

residents of Scott County when the Commission was presented with and presumably relied upon the very information it now argues should reset all of the Commission's statutory obligations.

Therefore, because the Commission waived its ability to bring its argument and because that argument is nevertheless unpersuasive, the Court finds that the Commission is not entitled to the relief it seeks on these grounds.

With the resolution of the Commission's argument, the Court now turns to Applicants' substantive claims under the TCA and Kentucky law.

B. <u>Whether the Commission Failed to Satisfy the TCA's Writing Requirement in Violation of 47 U.S.C. § 332(c)(7)(B)(iii).</u>

The next issue before the Court is whether the Commission violated § 332(c)(7)(B)(iii). Applicants argue that the Commission violated § 332(c)(7)(B)(iii) when it failed to issue written reasons for denying the Uniform Application "essentially contemporaneously" with the January 14, 2016 denial vote at the public hearing. The Commission does not directly dispute this argument. The Court concludes that because it failed to provide a decision for its denial in writing, the Commission violated the TCA's writing requirement.

i. <u>Overview</u>

Before directly offering the reasons for determining that the Commission violated § 332(c)(7)(B)(iii), the Court pauses to layout important background necessary to untangle Applicants' arguments.

The writing requirement of the TCA, § 332(c)(7)(B)(iii), and the thirty-day commencement-of-suit requirement, § 332(c)(7)(B)(v), are necessarily interwoven

18

when analyzing certain TCA claims. However, the writing requirement and the thirty-day clock in which to challenge an adverse decision are wholly separate concepts that work consecutively.

Under § 332(c)(7)(B)(iii), "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." Thus, the statute places an affirmative duty upon a locality to act and to prevent noncompliance with the TCA.

Section 332(c)(7)(B)(v), on the other hand, directs a course of action for any party seeking review of an adverse decision. It provides that "any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction." § 332(c)(7)(B)(v). In other words, it merely provides a timing requirement for parties who wish to seek judicial review of an adverse decision.

The time within which parties must challenge an adverse ruling is controlled by § 332(c)(7)(B)(v). The thirty-day clock does not begin to tick until the locality's administrative decision is definitive enough to qualify as a "final action" or a "failure to act." § 332(c)(7)(B)(v). To complicate things, the TCA does not define "final action." However, as the United States Supreme Court noted, "final action" is the issuance of the written notice of denial, not the subsequent issuance of reasons explaining the denial. *See Roswell*, 135 S. Ct. at 817 n.4 ("The relevant 'final action' is the issuance

19

of the written notice of denial, not the subsequent issuance of reasons explaining the

denial.") (citing *Bennett v. Spear*, 520 U.S. 154, 177–178 (1997) (agency action is

"final" if it "mark[s] the consummation of the agency's decision making process" and

determines "rights or obligations" or triggers "legal consequences" (internal quotation

marks omitted))).

Like "final action," the TCA does not define what constitutes a "failure to act."

However, the FCC addressed the issue in *In the Matter of Petition for Declaratory*

*Ruling to Clarify Provisions of Section 332(c)(7)(b) to Ensure Timely Siting Review &*

*to Preempt Under Section 253 State & Local Ordinances That Classify All Wireless*

*Siting Proposals As Requiring A Variance*, 24 F.C.C. Rcd. 13994, 14013 (2009) (the

"*Shot Clock Ruling*"). In that case, the FCC found that a municipality's failure to act

on an application for the construction of a new wireless service facility within 150

days of the application's submission was presumptively unreasonable and constituted

a "failure to act" that triggers the thirty-day clock to seek judicial review. *Id.* at 32,

37. However, the *Shot Clock Ruling* also explained that:

> [A] rigid application of this cutoff to cases where the parties are working
> cooperatively toward a consensual resolution would be contrary to both
> the public interest and Congressional intent. Accordingly, we clarify
> that a "reasonable period of time" may be extended beyond 90 or 150
> days by mutual consent of the personal wireless service provider and the
> State or local government, and that in such instances, the
> commencement of the 30–day period for filing suit will be tolled.

*Id.* at 49.

A decision from this district highlights an application of "failure to act" under

the TCA. In *Cellco Partnership v. Franklin County, Ky.*, a planning commission

argued that the plaintiff had improperly filed the action in federal district court

because the plaintiff filed the action before the planning commission's denial was final. 553 F.Supp.2d 828, 842 (2008). The planning commission argued that the thirty-day clock did not begin to run until June 14, the day on which the Planning Commission approved the minutes of an earlier meeting. *Id.* at 842. The Court noted that while the Planning Commission was correct in that there was no "final action" until June 14, it nevertheless found that the plaintiff's application was timely because the Planning Commission did not make a final decision on the plaintiff's application by April 26, the date by which both parties agreed a decision would be made. *Id.* In a way, *Cellco* presents the inverse of the *Shot Clock Ruling*. While parties can agree to extend the presumptive deadline, parties can also establish a date on which a decision must be made. In both situations, the failure to act by a specific date triggers the thirty-day clock for adversely affected parties to file a complaint.

As opposed to establishing when a party can bring a complaint and seek a remedy, a violation of the TCA's writing requirement answers the question of how a party can challenge an adverse decision and provides a cause of action for an adversely affected party once he or she can bring an action. The Supreme Court recently addressed the TCA's writing requirement. In *Roswell*, the Supreme Court rejected the majority view, including the Sixth Circuit's holding in *New Par v. City of Saginaw*, 301 F.3d 390 (6th Cir. 2002), that reasons for denial of an application must be stated in a denial letter or notice itself, and. In pertinent part, the Court held:

> that localities must provide or make available their reasons, but that those reasons need not appear in the written denial letter or notice provided by the locality. Instead, the locality's reasons may appear in some other written record so long as the reasons are sufficiently clear

and are provided or made accessible to the applicant essentially contemporaneously with the written denial letter or notice.

*Id.* at 811–12. In *Roswell*, the Court found that detailed minutes could suffice as an acceptable form of writing to convey reasons for denial. *Id.* at 818. To satisfy the "in writing" requirement, then, "these reasons need not be elaborate or even sophisticated, but rather . . . simply clear enough to enable judicial review." *Id.* at 815.

While holding that the reasons for denial need not be given in the same document denying an application, the Court also crafted a timing element into its holding. The Court held the locality must issue its reasons "at essentially the same time as it communicates its denial" so as to not impair either the applicant's decision to file suit or the court's subsequent review, or to allow the locality to "sandbag" the applicant with post hoc rationalizations only after suit has been filed. *Id.* The Court did not define what it meant by "essentially the same time," but in that case, the Court held that the City of Roswell violated the TCA's writing requirement because the twenty-six days it took to provide reasons after the City provided the written denial letter was too long a delay to meet the "essentially contemporaneous" requirement. *Id.* at 818.

The Supreme Court also recognized that this timing requirement necessarily intersects with the thirty-day clock in § 332(c)(7)(B)(v). Citing the *Shot Clock Ruling*, it held that "[o]nly once the denial issued would the 30-day commencement-of-suit-clock begin." *Id.* at 817. As a recent case from this district explains, a court delineates between oral and written denials for the purposes of the thirty-day clock for judicial

review. *See Skyway Towers, LLC v. Lexington-Fayette Urban County Government*, No. 5:15-cv-301-KKC, 2016 WL 817133, at * 5 (E.D. Ky. Feb. 29, 2016). *Roswell* requires that the written reasons be issued at essentially the same time as the written denial, not the oral denial. *See Skyway Towers, LLC*, 2016 WL 817133, at * 5. This is because it is the written denial that triggers the thirty-day clock for judicial review.

    ii.    <u>Applicants' Arguments</u>

With this background, the Court now turns to Applicants' arguments. Applicants first argue that the vote taken at the public hearing to deny the application on January 14, 2016 constituted a "final action" under KRS 100.347(5), which provides that a planning commission vote to approve or deny an application constitutes a "final action" under Kentucky law. Because Applicants had thirty days from that point to preserve their state law remedy, the Commission was required to provide reasons for the denial as set out in *Roswell*. Because the Commission did not provide written reasons contemporaneously with the "final action," the argument follows, the Commission's  delay and failure to act constituted a violation of the TCA's § 332(c)(7)(B)(iii).

Applicants conflate the "in writing" timing requirement, the thirty-day requirement for applicants to challenge any adverse "final action" or "failure to act" by a locality, and what is required under Kentucky law. Applicants argue that *Roswell* "recognizes the import of [state] statutory deadlines" when the Court cited *Bennett*, 520 U.S. at 177–178, in defining "final action" under the TCA. (DE 18-1, at p. 15). But nothing in *Roswell* indicates the Court recognized this broad import of

statutory definitions. Instead, the Court in *Roswell* relied upon the Administrative Procedure Act's finality requirement to define what the TCA itself did not define. *Roswell*, 135 S. Ct. at 817 n.4; *see Omnipoint Holdings, Inc. v. City of Cranston*, 586 F.3d 38, 45-47 (2009) (1st Cir. 2009) (drawing upon the meaning of "final" agency action under the APA in construing the TCA's own finality requirement). Using this definition, *Roswell* made clear that for the purposes of the TCA writing requirement, it is the issuance of the written denial that constitutes the "final action" and which triggers the thirty-day clock for judicial review. *Roswell*, 135 S. Ct. at 817, n.4 ("The relevant 'final action' is the issuance of the written notice of denial, not the subsequent issuance of reasons explaining the denial."); *Skyway Towers, LLC*, 2016 WL 817133, at * 5.[2]

The relevant question for the writing requirement is not, as Applicants suggest, influenced by whether § 332(c)(7)(B)(v) and other state jurisdictional statutory provisions have been triggered. Deciding whether the Commission violated the TCA's writing requirement concerns a different analysis. The only relevant issue for the purposes of analyzing whether the Commission violated § 332(c)(7)(B)(iii) is whether the Commission provided its reasons for denying the application in writing

---

[2] The Court recognizes the tension between KRS 100.347(5) and § 332(c)(7)(B)(v) insofar as *Roswell* indicates that the thirty-day clock under § 332(c)(7)(B)(v) does not start until the conveyance of a written denial and KRS 100.347(5) starts the state law clock when the vote is taken to approve or disapprove the matter before the administrative body. Perhaps this what Applicants mean when they state: "In Kentucky, KRS 100.347(5) and KRS 100.987(4)(c) combine as to require prompt decisions in order for the locality to simultaneously comply with state law, the Telecommunications Act of 1996 and with [*State of Tennessee ex. rel. Wireless Income Properties, LLC v. City of Chattanooga, et. al.*, 403 F.3d 392 (6th Cir. 2005], as well as *Roswell*." (DE 18-1, p. 16). However, nothing precludes Applicants from seeking a state remedy in state court for a violation of state law and subsequently filing a federal action.

24

and did so "essentially contemporaneously" with the written denial. *Roswell*, 135 S. Ct. at 818.

Applicants assert that the  failure to issue a written denial of the wireless facility within the thirty-day statutory appeal period prescribed by KRS 100.347(2)[3] amounts to a "functional denial" of their application in violation of the TCA. Defendants, again, do not directly respond to this argument.

In *State of Tennessee ex. rel. Wireless Income Properties, LLC v. City of Chattanooga, et. al.*, 403 F.3d 392 (6th Cir. 2005) ("Wireless"), Wireless Income Properties, a telecommunications company, sued the City of Chattanooga under the TCA after the city failed to issue permits for monopole communications towers. 403 F.3d at 393.  Between the time that Wireless Income Properties filed its applications for permits and the time it filed suit, the City placed a moratorium on the issuance of permits while it revised local zoning ordinances. *Id*. The City of Chattanooga took no action on the applications during this nine-month moratorium. *Id*. Instead, following the passage of the amended zoning ordinances, the city called Wireless Income Properties on the phone to inform it of the denial. *Id*. at 398. No written decision as to the status of the permit application was provided by the city. *Id*.

---

[3] In full, KRS 100.347(2) provides:

> Any person or entity claiming to be injured or aggrieved by any final action of the planning commission shall appeal from the final action to the Circuit Court of the county in which the property, which is the subject of the commission's action, lies. Such appeal shall be taken within thirty (30) days after such action. Such action shall not include the commission's recommendations made to other governmental bodies. All final actions which have not been appealed within thirty (30) days shall not be subject to judicial review. Provided, however, any appeal of a planning commission action granting or denying a variance or conditional use permit authorized by KRS 100.203(5) shall be taken pursuant to this subsection. In such case, the thirty (30) day period for taking an appeal begins to run at the time the legislative body grants or denies the map amendment for the same development. The planning commission shall be a party in any such appeal filed in the Circuit Court.

The United States Court of Appeals for the Sixth Circuit found the City's informal denial of applications constituted violation of TCA's writing requirement. *Id*. at 398. Contrary to Applicants' suggestion, however, the Sixth Circuit found that the informal denial did not hinge upon the expiration of a state statute. Rather, the court simply stated the City violated writing requirement of the TCA "for the simple reason that no written documentation of the City's decision was ever provided to Wireless." *Id*. at 398.

iii.   <u>Application</u>

The same simple reason applied *Wireless* carries the day in the present case. At a public hearing, the Commission voted 6-1 to deny Applicants' Uniform Application on January 14, 2016. On February 11, 2016, almost a month later, the Commission approved the minutes of the hearing. Eleven days later, the Commission sent Applicants a copy of the minutes in an email attachment, but the Commission never issued a written denial or notice of denial of Applicants' Uniform Application. As of March 15, 2016, the date the administrative record was filed (DE 15), the record does not contain any written correspondence from the Commission to Applicants denying the application aside from the minutes. For this reason alone, the Commission has failed to satisfy the TCA's requirements under § 332(c)(7)(B)(iii).

The plain language of § 332(c)(7)(B)(iii) makes clear that any decision by a locality "shall be in writing." As discussed above, the Supreme Court in *Roswell* held that a locality no longer had to provide the reasons for denial "in the same writing that conveys the locality's denial of an application," *Roswell*, 135 S. Ct. at 815, but

that the locality must provide written reasons "at essentially the same time as it communicates its denial." *Id.* at 816. While it is true that "a locality may rely on detailed meeting minutes" to provide its written reasons for denial, *id.* at 816, *Roswell* does not imply that submitted minutes suffice as the written denial required by the TCA.

The timing requirement, moreover, was created to allow localities like the Commission the opportunity to develop its reasons and to avoid the squeeze of providing reasons for the denial at the exact same time that the locality made the written denial. *See Roswell*, 135 S. Ct. at 816 ("We hasten to add that a locality cannot stymie or burden the judicial review contemplated by the statute by delaying the release of its reasons for a substantial time *after it conveys its written denial*.") (emphasis added). In this case, however, the analysis does not even get that far. Here, there was never a written denial of Applicants' Uniform Application. The timing requirement created in *Roswell* presupposes the issuance of the written denial. It does not excuse it entirely.

Therefore, as in *Wireless*,[4] this Court finds that the Commission has violated the substantive and procedural requirements of the TCA by failing to provide a written denial of Applicants' Uniform Application.

---

[4] To be clear, *Wireless'* citation to the three factor test espoused in *New Par v. City of Saginaw*, 301 F.3d 390, 394 (6th Cir. 2002), which has since been abrogated by the Supreme Court in *Roswell*, has no bearing on the fundamental requirement under § 332(c)(7)(B)(iii) that a locality must at the least provide a written denial.

C. Counts II-IV: 47 U.S.C. § 332(c)(7)(B)(iii)-Substantial Evidence; 47 U.S.C. § 332(c)(7)(B)(i)(II)-Effective Prohibition; KRS 100.987(10) and KRS 100.347-Denial in Violation of State Law)

Because the Court finds that the Commission has violated the TCA by failing to provide a written denial of Applicants' Uniform Application, the remaining arguments need not be addressed. Applicants are, however, entitled to relief on the remaining claims. The Commission's entire response and motion for summary failed to respond to and, for that matter, explicitly accepted most if not all of Applicants' substantive TCA and Kentucky law claims. For this reason alone, Applicants are entitled to summary judgment.

When a party completely ignores or fails to address an issue, a Court may be justified in deeming an argument abandoned. The Sixth Circuit has made clear when abandonment occurs and the consequences abandonment carries.

> This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment. *See Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) (holding that a district court properly declines to consider the merits of a claim when a plaintiff fails to address it in a response to a motion for summary judgment); *Clark v. City of Dublin*, 178 F. App'x 522, 524–25 (6th Cir. 2006) (recognizing that the failure to respond properly to motion for summary judgment arguments constitutes abandonment of a claim); *Conner v. Hardee's Food Sys.*, 65 F. App'x 19, 24–25 (6th Cir. 2003); *see also Colston v. Cleveland Pub. Library*, No. 1:12–CV–204, 2012 WL 3309663, at *2 n. 2 (N.D. Ohio Aug.13, 2013) (deeming a claim abandoned and granting summary judgment when a plaintiff "did not respond or even mention [the] claim in her opposition to Defendants' motions for summary judgment").

*Brown v. VHS of Mich., Inc.*, 545 Fed. App'x. 368, 372 (6th Cir. Oct. 10, 2013). The Eastern District of Kentucky has followed this approach. *See Smith v. Flinkfelt*, No. 13-CV-02, 2014 WL 1331182, at *4 (E.D. Ky. Mar. 31, 2014) (collecting cases).

Applicants' motion for summary judgement is more than thirty-five pages in length and includes a thorough discussion of the reasons why they are entitled to summary judgment. The Commission's own motion for summary judgment is eight pages in length and discusses its sole theory for why it is entitled to summary judgment. The Commission does not directly respond to any of Applicants' substantive claims. In fact, the Commission acknowledges its refusal to respond in its motion for summary judgment. In addressing its argument that the December 22nd amendment to Applicants' Uniform Application constituted a new application, the Commission stated:

> As argued herein, the seminal factual issue before this Court is the date upon which the 'Uniform Application' was filed. **If this Court accepts Applicants' position that the filing date is October 1, 2015, Applicants' arguments are well taken**. Alternatively, if this Court determines that the filing date is the date of the Amended Uniform Application of December 22, 2015, Applicants' Motion for Summary Judgment should fail.

(DE 21-1) (emphasis added).

Having disposed of the single issue the Commission brings to this Court, what remains is not only a failure to respond to Applicants' arguments, but affirmative approval of their position. The Court therefore concludes that the Commission has abandoned these claims and grants Applicants' motion for summary judgment on Counts II-IV.

## IV.    PROPER RELIEF

The TCA does not state the appropriate remedy for violations of § 332(c)(7)(B)(iii). The Sixth Circuit has repeatedly concluded that "where the defendant denied a permit application, and that denial violated the TCA's 'in writing' and 'substantial evidence' requirements, the proper remedy is injunctive relief compelling the defendant to issue the requested permit." *Wireless*, 403 F.3d at 399; *Cellco Partnership*, *553* F.Supp.2d at 853. Accordingly, the Court will issue an injunction compelling the Commission to issue Applicants the permits necessary for the construction of the proposed wireless facility.

## V.    CONCLUSION

For the foregoing reasons, the Court hereby **ORDERS** as follows:

1.  Applicants, PI Telecom Infrastructure V, LLC, Cellco Partnership d/b/a Verizon Wireless, and Albert Burke's Motion for Summary Judgment (DE 18) is **GRANTED**.

2.  Defendant Georgetown-Scott County Planning Commission's Motion for Summary Judgment (DE 21) is **DENIED**.

3.  Defendant Georgetown-Scott County Planning Commission is hereby **ORDERED** to provide any and all permits necessary for the construction of the proposed wireless facility.

Dated February 10, 2017



KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY